# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**UNITED STATES OF AMERICA**

**vs.**                              **Case No.: 3:21-cr-9-BJD-JRK**

**GRETCHEN MICHELE CAMP**

_____

## DEFENDANT GRETCHEN MICHELE CAMP'S AMENDED[1] SENTENCING MEMORANDUM

Wm. J. Sheppard, Esquire
Florida Bar No.: 109154
Elizabeth L. White, Esquire
Florida Bar No.: 314560
Matthew R. Kachergus, Esquire
Florida Bar No.: 503282
Bryan E. DeMaggio, Esquire
Florida Bar No.: 055712
Jesse B. Wilkison, Esquire
Florida Bar No.: 118505
Camille E. Sheppard, Esquire
Florida Bar No.: 124518
Sheppard, White, Kachergus & DeMaggio
215 Washington Street
Jacksonville, Florida 32202
Telephone: (904) 356-9661
Facsimile: (904) 356-9667
Email:  sheplaw@sheppardwhite.com
COUNSEL FOR DEFENDANT

---

[1] Defendant's Sentencing Memorandum has been amended due to the signature page not being signed. Otherwise, the Sentencing Memorandum is identical.

# INDEX TO MEMORANDUM

**Page No.:**

I.   **HISTORY OF THE CASE**      4

II.   **INTRODUCTION**      6

III. **MS. CAMP'S ABUSE CONTRIBUTED TO HER PARTICIPATION IN THESE OFFENSES**      8

   A.   Early Childhood      10

   B.   The Camp's Relationship      13

   C.   The Rips: How They Started and How They Continued      19

   D.   Everett's Lies About the Couple's Source of Wealth      30

   E.   Tourette's or Bad Behavior?      31

IV.   **TEXTS AUTHORED BY MR. CAMP SUBSTANTIATE HIS ABUSE**      32

V.   **APPLICABLE LAW AND ANALYSIS**      41

   A.   Sentencing Overview      41

   B.   Advisory Guideline Range      42

VI.   **A SENTENCE OF 24 MONTHS WOULD BE BEST TO SATISFY THE GOALS OF 3553(a).**      43

   A.   Need for Just Punishment in Light of the Seriousness of the Offense      43

      1.   Degree of Intent (Mens Rea)      44

      2.   Ms. Camp was not motivated by improper purposes      45

      3.   Ms. Camp has been punished      46

      4.   Need for Deterrence      46

## INDEX TO MEMORANDUM (Cont.)

**Page No.:**

5.   Need for Incapacitation: Ms. Camp poses an
     exceptionally low risk of recidivism                                 47

6.   Need to Avoid Unwarranted Disparities and Unwarranted
     Similarities                                                          49

7.   Need to Provide Restitution to Victims of the Offense      50

D.   The Guideline Range Provides No Useful Advice Because
     it is Not Based on Empirical Evidence or National
     Experience, and fails to promote any Purpose of sentencing  51

VII.   CONCLUSION                                                         53

# I.

## HISTORY OF THE CASE

After a routine audit of its finances, Swisher International discovered a substantial amount of money had been stolen from it and traced the theft to one of its employees, Gretchen Camp, who was then working as an account manager for the company. Upon being confronted with the theft, Ms. Camp confessed her guilt to both her employer and an investigator for the Jacksonville Sheriff's Office, but she did not disclose the extent of her embezzlement and she attempted to downplay her husband's involvement in the theft. She was arrested, released on bond, and charged in state court with diverting Swisher's money through a scheme whereby she submitted and fraudulently authorized the issuance of a series of checks for invoices she had submitted on behalf of Lodge and Anchor, a company owned by her husband's best friend. After her first arrest, prior diversions of tax rebates were discovered by Swisher, which led to her being re-arrested. After her second arrest, she was again released on bond as the result of a stipulation that any funds used to obtain her release would be returned to Swisher upon the conclusion of the state prosecution. Those funds have indeed been returned to Swisher. Her criminal cases were consolidated.

Between her first and second arrest, Ms. Camp's husband, Richard Everett Camp, was likewise arrested on state charges for his involvement in this scheme. He

was represented by his initial counsel, Jesse Dreicer, until he hired substitute counsel, Curtis Fallgatter, in the spring of 2019. Thereafter, he was rearrested for money laundering charges as the result of conduct which occurred after his first arrest.

On June 24, 2019, substitute counsel filed a Motion to Dismiss and/or Vacate Arrest Warrant and Supplement to Motion for Reduction of Bond, which attached a copy of an affidavit signed by Gretchen Camp and which counsel claimed exonerated Mr. Camp. This affidavit had been obtained without the knowledge or consent of Ms. Camp's counsel, after her counsel had specifically advised Mr. Camp's counsel that such affidavit was perjurious. Mr. Camp's motion was denied and he has been detained since his second arrest. While the state proceedings were pending, the Government filed a forfeiture action and subsequently elected to conduct a separate investigation of the theft, which ultimately led to the instant prosecution.

While the state case was pending, Mrs. Camp met with local, state, and federal investigators, and their counsel on a number of occasions, and disclosed to them the mechanics of the illegal schemes, its participants, and fully accounted for how the proceeds of the conspiracy were spent. She cooperated with law enforcement despite specific death threats made by her husband against her, her friends, her family and

even her attorneys if she told federal investigators the truth about his involvement in the crimes changed.

On February 18, 2021, Ms. Camp entered pleas of guilty to a two count Information charging her with both the tax rebate diversion and the payment by Swisher of fraudulent invoices prepared by her and paid to Lodge and Anchor. [Docket 20]. She did not contest the Government's forfeiture action and fully cooperated with its efforts to recover all proceeds of the fraud, including bank accounts, real estate, as well as numerous expensive firearms purchased with proceeds of the fraud. She also consented to the entry of a civil judgment brought by the insurance company which had compensated Swisher for its losses. *See also* Doc. 31) at ¶ 41. As the result of her cooperation, the Government has filed a Motion for Downward Departure of Defendant's Sentence Based upon Substantial Assistances, recommending this Court grant Ms. Camp a two-level reduction in her offense level. (Doc. 30).

## II.

## INTRODUCTION

The purpose of this memorandum is not to excuse or explain away Ms. Camp's conduct. She recognizes she is responsible for stealing  millions of dollars from her employer. She also understands she could have chosen a different path had she exhibited the strength and moral values she learned as a child. She acknowledges

she must make amends for her crimes and she stands ready to accept the sentence imposed by this Court.

While Ms. Camp whole-heartedly accepts responsibility for her conduct, there are significant facts which will provide this Court with a complete understanding about how this crime was planned and executed, and why Gretchen became a willing participant in it. How did a woman of deep religious faith, raised with strong moral values and the guidance of two loving parents jettison all she believed to steal money she did not need or want? After her arrest, Ms. Camp embarked upon a substantial course of therapy with Ms. Linda Yeldell, a pastoral counselor affiliated with Mandarin Baptist Church, to understand how her prolonged abuse at the hands of her husband and co-conspirator played a significant role in the commission of her crimes.

Simply, Gretchen Camp was subjected to over a decade of prolonged psychological, emotional, and physical abuse by the man who was supposed to honor her above all others. As a result of this abuse, she programmed herself to be responsible for satisfying his every want and need. In addition to physical violence, her husband systemically conditioned Gretchen to put his commands over even her Christian faith. This systematic abuse it contributed to a number of Gretchen's decisions, both before and after her arrest, and should be considered by this court when it sentences her.

## III.

## MS. CAMP'S ABUSE CONTRIBUTED TO HER PARTICIPATION IN THESE OFFENSES

The dynamics of domination and control of a spouse or partner through the use of physical, psychological, and emotional violence has only recently been recognized and understood. In addition to the literature about spousal abuse, a growing body of research has now been devoted to how certain individuals, of both sexes, employ certain - almost predictable - tactics to coerce their victims to commit acts destructive to both themselves and to others under their control.

Cases throughout the country have examined the battered spouse syndrome in the context of spousal homicide. *See State v. Hickson,* 630 So.2d 173 (Fla. 1993). Cases have involved individuals who use partner manipulation and abuse to actually persuade their victims to commit crimes themselves. The federal prosecution of Keith Raniere and the cult he called NXIVM, sheds light on the phenomenon of an individual who essentially programs his victims to follow any and all commands without question. *See United States v. Raniere*, 18-CR-204-1 (NGG) (VMS) (E.D.N.Y. Apr. 29, 2019). While Mr. Raniere was not married to his victims, his case is illustrative of how a charismatic individual can manipulate his devotees to engage in conduct that is self-destructive and criminal. Physical violence is instrumental in maintaining domination, but affection (both feigned and promised) is an equally effective tool of control.

Like Mr. Raniere, Mr. Camp employed "love bombing" and domination to convince his wife she was uniquely chosen and spiritually obligated to follow his every command without question. In addition to physical violence, he actively exploited his wife's religion to convince her that it was her Christian duty to "honor" him and place his command above all others. Everett Camp essentially recruited his wife into his Cult of One, where anything other than total compliance was met with both physical violence and spiritual condemnation.

Dr. Lenore R. Walker, nationally recognized for her work with victims of spousal abuse, has written extensively about the "Battered Woman Syndrome." Her work examines women who have killed their abusers, but her analysis also provides insight into how abusers manipulate their victims not only through violence but also through the withholding of intimacy and approval. Over time, "a three-phase cycle of abuse" emerges, which reinforces the victim's belief that they are responsible for the violence they suffer. "If only" they could obey their partner as required, they could return to an "idealized" version of their relationship. In the first phase of this cycle, tension builds, and the couple begins arguing over seemingly small matters. The argument leads to the "acute" battering phase, followed by the "loving" contribution phase. Walker, Shapiro, Akl, Introduction to Forensic Psychology at 75 (2d ed. 2020). As the victim begins to distrust her own perceptions of events, she begins to view her abuse as "inevitable" and beyond her control, while also

9

paradoxically believing complete acquiescence to her abuser's demands will stop the abuse.

There was another factor, though, which magnified Everett's manipulation of his wife and was reminiscent of cult indoctrination, which put him firmly in control of his wife's behavior. That contributing factor was Gretchen's religious faith. Gretchen might have left Everett early in their marriage, but she was stopped by an seemingly insurmountable obstacle. As a result of her deeply religious upbringing, she believed marriage was a sacred institution, and that Everett was ordained by God to be her husband. Raised as an only child in an extremely close and spiritual family, who placed a premium on obedience to God's word, she believed she would be violating her religious upbringing should she divorce. Her husband was fully aware of her beliefs and used them to his maximum advantage. Long before Gretchen took the first steps to embezzle money from her employer, she had accepted her husband's self-ordination as the one she must obey at all costs. She had been raised in a loving but very cloistered environment, which left her ill-prepared to stand up for herself against the violence she endured.

A.    **Early Childhood**

Gretchen was born February 8, 1982 at Norfolk General Hospital. An adoption arranged before her birth made it possible for her parents George and Diane Garris to be at the hospital during Gretchen's delivery. Gretchen went home with

her parents upon her discharge from the hospital. An only child, Gretchen was raised in a deeply religious family, who provided her with a stable and loving home. Her parents sheltered her and raised her in the loving confines of their Baptist church community. Obedience to one's family and one's faith were central tenants of Gretchen's upbringing.

At the time of Gretchen's birth, George worked at the Naval Station in Norfolk as a draftsman. Her mother remained at home to care for Gretchen. Like his daughter, George was an only child, born and raised in Norfolk. His parents were hardworking and modest; his father was a repairman and his mother worked at the local Woolworth's. After he graduated high school, George signed up for a drafting apprenticeship with the Navy, which became his lifelong profession.

George's parents, like their son, were also deeply religious, regularly attending the services at their Baptist Church. They lived simply, with the necessities and no more. Displays of material wealth were viewed with disapproval. Still, if they were frugal in their possessions, they were happily generous in their love for their only granddaughter. Gretchen was a frequent visitor to the home of her paternal grandparents.

Sadly, Gretchen's mother Diane did not enjoy the same warm relationship with her parents. As a child, Gretchen believed this estrangement was due to her mother's rejection of her parents' religious affiliation. Diane had been raised in the

Catholic Church, and her parents were committed to its religious doctrines. Within Diane's family, marrying outside the Catholic faith was considered unthinkable, and when Diane not only did so, but also adopted her husband's church as her own, her parents made their displeasure known. Their disapproval continued throughout Gretchen's childhood.

Gretchen visited her maternal grandparents infrequently, usually at family functions. From her earliest memories, it was made clear to her that she was not permitted to stay at her grandparents' house overnight. She was allowed to attend family parties with her parents, but her grandfather scared her. A high-ranking military officer, who demanded complete and unquestioned obedience, he seemed angry and intimidating. Those who did not do precisely as he commanded were ostracized and left without family support. Only later did Gretchen learn that her grandfather was also a serial child abuser; his victims were his children and grandchildren. He was ultimately sentenced to prison for molesting Gretchen's cousin, but there were a number of victims within the family who suffered from his abuse. Although her parents did not know of the molestation at the time it was occurring, Gretchen firmly believes their actions protected her from almost certainly becoming another of her grandfather's victims.

In 1995, the civil service portion of the Norfolk Base was closed and its employees given the option to move to other bases in the county. Gretchen and her

family moved to Jacksonville and the family began attending Mandarin Baptist Church, which is where Gretchen and Everett met while attending the same church.

## B.   The Camps' Relationship

As a young teen, Gretchen and Everett would see one another at church services, but there came a time when Everett no longer attended church with his family. She learned Everett had been sent to a military boarding school for behavioral issues. As a result, the two teenagers did not know each other well until the summer before Gretchen left for college. As she had every year since moving to Jacksonville, that summer Gretchen attended a sleep-over Bible camp in Deland, as part of her church's youth group. Everett had returned home from boarding school and also attended the camp. It was here their relationship quickly developed.

Aware Gretchen's faith was a central component of her life, Everett wrote her a letter, telling her God had spoken to him and prophesized the next woman he asked for a date would be his wife. From the very first date, Mr. Camp staked his claim. Gretchen was chosen by God to be Everett's wife. If God had spoken, Gretchen would be disobeying his command if she rejected him. From being strangers to essentially committing to marriage on the first date, Gretchen was quickly pulled in by Everett's certainty that God had declared their destiny.

Although she was swept up in Everett's certainty, problems emerged as soon as she left Jacksonville to attend college in Orlando. Gretchen wanted to enjoy her

college life away from home, but Everett was jealous of her new life and demanded she return to Jacksonville. This conflict began a cycle of accusations, jealously, and unannounced appearances by Everett - sometimes in the middle of the night - to either berate Gretchen or to apologize for his jealousy. When his possessive and controlling behavior led Gretchen to attempt to break up with him on several occasions, Everett swore he could change, and Gretchen believed him. Often, he explained away his behavior by claiming he suffered form ADHD, Tourette's, bi-polar disorder, a personality disorder, and depression. Over time, Gretchen accepted this explanation without ever being privy to the names of his physicians, his treatment plan, or even what medications he was taking for the conditions he claimed he had. As with so much of what Everett told her, she was expected to accept his claims without argument.

The fighting about Gretchen's residence escalated, and she concluded the only way she could satisfy Everett was to return to Jacksonville. Ironically, as soon as she returned, Everett moved to Georgia for "work". Still, their relationship seemed to improve, and Gretchen planned a modest wedding at their church. As the wedding date neared, Everett became more distant and disapproving, more than once telling her she was "too fat" and unattractive to be his wife. His constant criticism came to a crescendo the night they were married when he refused to consummate their marriage. Her offense, according to Everett, was her failure to follow the explicit

command he had given her in advance of their wedding about how she was to prepare her body prior to their honeymoon. Gretchen was devastated; she had done what she thought he wanted, but he informed her she was "dirty", and he would have nothing to do with her until she complied with his explicit instructions. This rejection set into play the pattern of Everett using Gretchen's need for his approval to manipulate her, in an ever-escalating system of demand, rejection and compliance.

This pattern of criticism, with the accompanying withholding of affection of approval if Everett's demands were not met, was soon to get much, much worse. The fat shaming, which had commenced even before the wedding, became routine. Daily, he would instruct her "what she was doing wrong", from her clothes to her fingernail polish. Everett always selected what Gretchen wore, telling her things like, "make sure you wear tight shorts but hold your fat stomach in." With full knowledge of his wife's body image issues, Everett used her body insecurities to convince her she was unattractive and, more significantly, lucky to have him.

Coupled with her own insecurities was Ms. Camp's religious upbringing, which had taught her that it was a woman's duty to be submissive to her husband. Just as God is the head of the Church, so too is the husband the head of the household. This belief may be useful to those who legitimately practice it in good faith. When it is used to subvert the love and affection of those who believe, it can cause harm

beyond measure. Coupled with systemic physical violence that was to come, it led Gretchen to believe there was no way out of her marriage.

Everett also began to isolate Gretchen her from her support network. He instructed her not to discuss their problems or business with anyone. He was rude and overbearing around Gretchen's parents, making clear he disapproved of their simple lifestyle. A distance developed between Gretchen and her parents which remained until after her arrest. (See attached Exhibit "A"). Everett also told her to quit confiding in her best friend Joy. Soon after their wedding, Everett was in control of the narrative that Gretchen was fat, lazy, and stupid, a narrative that only ceased when his bond was revoked in 2019, and he could no longer communicate with his wife.

As with most abusers, Everett's emotional abuse did not occur in isolation. Within months of their wedding, a minor argument set Everett off, and he flipped a coffee table across the room, breaking it in the process, and also putting a large hole in their wall. Everett said nothing. Gretchen said the first of many, many "I am sorry", even though she had done nothing to be sorry for. Of course, she cleaned up his mess as he told her to "stop crying" and "quit being a baby" and "go wash your face". When she did as instructed, he apologized saying, "I'm sorry but you push my buttons." This phrase was also one she would come to know well in the years to come.

The cycle of abuse was firmly established. Something would set Everett off and he would aggressively begin to accuse Gretchen of some minor infraction. Sometimes, if she stayed very quiet and submissive, his rage would blow over. More often than not, however, she would make the mistake of trying to explain, or worse, to defend herself. Any such effort enraged her husband, and she was made to pay dearly for her disobedience. Ninety percent of their arguments ended in some kind of physicality - broken mirrors, broken furniture, holes in the walls, and eventually, slaps to the head, pushes to the floor, and guns pointed at her. Over time, she knew to look down, keep quiet and do anything possible to appease him. His familiar refrain was she "pushed his buttons" or her conduct "forced" him to hit her. He would frequently apologize, blame his claimed medical conditions, and swear never to do it again.

One topic in particular sent her husband completely over the edge and it was the subject of their finances. No matter how much the two of them made, it was never enough in her husband's view. Consistently every few weeks, Everett raged about paying the couple's bills. Gretchen could not understand why. It appeared they had sufficient funds to support themselves and Gretchen was mindful of her purchases, but whatever was earned was never enough. Gretchen knew Everett had been raised in a family of great means and Everett made it clear he believed he was

entitled to live the lifestyle he had enjoyed as a child. Still, the couple wanted for nothing and there was no reason their finances should cause such anger.

Without consulting Gretchen, Everett decided it was time to buy a home and began looking for one that suited his tastes. In what would become his future practice, he located homes he liked, and only then took Gretchen to view his selection. He handled all the purchase details. Gretchen attended the closing but had no part in the negotiations or financing. When they received the keys, she did not even know how much their monthly mortgage payment would be.

It was during this time that Everett's violence began to accelerate. He quit attending church and instructed his wife to do the same because "all the preachers talk about is tithing." Gretchen reluctantly agreed to his demand. Her isolation from her family and her church was complete. The happy home she had envisioned was a myth, but she confided to no one about the abuse.

Although Everett claimed to be happy about their new home purchase, he was in a bad mood and their arguing increased. Their fights inevitably centered around the couple's finances. Everett was dissatisfied with his job. According to him, he was always better, smarter and a better manager than his employers. He was never paid what he deserved, and he used the "stress" of his job as his excuse for his violence against his wife.

He began to tell Gretchen that, outside of Jesus, he was "the best person on Earth." It was his expectation his wife agree. If she did not, there would be severe consequences. He intentionally provoked fights and once started, violence was their inevitable end. Gretchen quit inviting friends into the home; she was afraid people would ask about the numerous holes in the walls and doors of their new purchase. From breaking the porcelain figurines his wife collected, to ripping out shelves in their bedroom, nothing was off limits, including Gretchen herself. If she was reading, he snatched her book out of her hand and ripped it in half. Sometimes, he slapped her in the face and knocked her to the ground, particularly if he thought Gretchen was "not paying enough attention" to him. These incidents were not isolated; and their frequency was increasing. Still, Gretchen remained committed to her marriage.

## C.   <u>The Rips: How They Started and How They Continued</u>

In September of 2013, Gretchen received a promotion which resulted in a significant pay raise. At first, Everett was pleased with her new job title. Within months, his pleasure turned to rage, as he railed about how much he hated his job and how much more money his wife should be paid. From the beginning of their marriage, Everett paid all the bills, and handled all the finances, with the exception of one bill he "allowed" his wife to pay. Without even knowing the true status of their finances, Gretchen knew better than to question Everett about them. To do so would guarantee an argument, a hole in the wall, a slap to the face, or worse.

Because she brought her work home and because Everett specifically asked her to explain it to him, he was intimately aware of the tax rebate system utilized by Swisher when paying federal excise taxes. In addition to this knowledge, he was aware that Swisher received large refunds when those taxes were overpaid. He also knew his wife had received an award for reprogramming Swisher's system so that it would receive more of a refund than in previous years.

Soon after his wife received a promotion that gave her access to the tax applications, Everett's complaining about the couple's finances began in earnest. Subtly at first, Everett told Gretchen she was "being taken advantage of" by Swisher and that she was "not being paid what she was worth." Those compliments soon metastasized into "we have to get the house and car paid off". Everett also claimed the reason for his violence toward Gretchen was because of his financial stress even though, with two incomes, Gretchen could not understand how their finances had become so dire.

Everett had kept guns in the home as long as Gretchen knew her husband, a fact she accepted without question. Gretchen remembers vividly the first time he pointed a gun at her. It was the week before she submitted the "test" invoices to see if the fraud would be detected. It began as all his assaults did, with an argument about their finances and the "stress" he was under in his job. During his rant, he decided Gretchen was not paying sufficient attention to him. He pushed her to the

ground, picked up the gun he left on his bedside table, and asked "Do you want me to put a bullet in your head?" He also threatened to shoot her and then kill himself.

Gretchen was sufficiently trained by Everett to stay silent, but she knew things had taken an ominous turn and she knew what he was capable of. She was more afraid of her husband than she was of any consequences she would suffer if she stole her employer's money. She decided to test the system to see if she could fraudulently alter the tax rebate forms in order to divert them from Swisher to an account belonging to the couple. To be clear, Everett Camp not only knew about Gretchen's embezzlement, he actively sought it out, helped plan it and, used the stolen money to fund his extravagant lifestyle.

Once Everett knew Gretchen had submitted the fraudulent paperwork, he continuously demanded to know when the money would begin to flow into their account. He showered her with praise, assuring her "everyone else" at Swisher was getting a piece of the pie, while also telling her she was not getting paid enough. He told her the rebates were the bonus she should be receiving. Gretchen knew this claim was a lie, but she also knew her disagreement would cause Everett to explode, so she said nothing.

Of course, Everett assured her that the theft would "only" be to pay off their debts. In fact, the initial embezzlement proceeds were enough to pay off all of their existing bills, including their mortgage, their car loans and Gretchen's student loan

debt. Although worried about being caught, Gretchen lied to herself that her diversion of the rebate checks would not be noticed. Now, she and Everett could live the life he promised she envisioned when they first married.

It was not to be. Everett quit his job after the first rebate check was deposited to their account. He instructed her what to say if anyone asked about their finances. At work, Gretchen was to tell people Everett ran a successful trucking brokerage firm, earning hefty fees by connecting suppliers and drivers hauling large commercial loads. With others, Everett instructed her to tell people he had received a large inheritance and no longer needed to work. Gretchen's parents were suspicious, so he kept them away from their daughter. When out at dinner, with a large group, Everett loudly paid the bill for everyone, making a point to tell the group he was paying the bill. Not once did he say Gretchen was "earning" millions of dollars as a Swisher accountant. Even he was aware that this story was not believable, so he found another explanation for their newfound wealth.

Like so many of Everett's promises, he had no intention of changing his behavior and he quickly ran through the tax rebates stolen from Swisher. Gretchen began to worry about his next demand, especially since a routine company audit had stopped the issuance of rebate checks ending the fraud, at least temporarily. Her worries were confirmed when Everett began demanding that she "ask Lou for more money." In the period to come, whenever he wanted Gretchen to submit fraudulent

invoices, Everett would tell her to "talk to Lou" knowing full well that Lou had nothing to do with Gretchen's theft.

Gretchen was trapped. The theft of the tax rebates did not satisfy him, so she knew more money was not going to placate him. Enough was never enough. In her presence, Everett dropped all pretenses about the source of their new-found wealth. Instead, he continued to assure her that "everyone" at Swisher was doing the same thing, and she was only receiving the money she was "entitled to". Praise for being a "good girl" would turn into impatience, then anger then violence, as he would demand "When will we be getting more of these?"

Throughout this time, Everett handled all the finances, made all the major purchases, and paid all the bills, with the exception of a small credit card bill which he insisted she pay. Not only did Everett control the embezzled funds, Gretchen also dutifully signed every paycheck over to her husband. Even small purchases were policed by him. He also told her exactly how and where to deposit the fraudulent rebates - into an account he controlled.

Everett became determined to buy a large tract of land in Georgia with a hunting lodge on it. Gretchen had no desire to make this extravagant purchase, but Everett was not to be deterred. He located the land , negotiated the purchase price of $355,000, and left no room for disagreement. He then immediately began a series of costly improvements. He also moved to the property and returned home only on

weekends, and usually only for one night. His purchases began in earnest - ATVs, gold, silver jewelry and a cache of weapons, suppressors, and ammunition valued in excess of over $150,000. His purchases from Amazon began to stack up so quickly they were unopened. Once he purchased the Georgia property, he began to earnestly prepare for the end of a functioning government. He purchased cases of mylar blankets, rations, waters, and purchased goats and chicken, all the while planning for the installation of an inground 100' pool. He also put a $50,000 deposit on the purchase of additional property across the street from the farm. He also moved out of the marital home, living in Metter fulltime and only coming home one weekend a night to visit his wife and, of course, confirm more money would be arriving soon. Although still married, their lives were separate. The only thing connecting them was Everett's need for more money to buy the things he desired.

The second tax rebate fraud netted the couple approximately $400,000. The Metter property was purchased for $335,000, with $65,000 left over. Gretchen had no idea how Everett spent the remainder, but he began a series of expensive improvement on the Georgia property, including digging a ten acre lake and installing hiking trails. And, of course, the small hunting lodge was turned into his domain, with his hundreds of semi-automatic weapons proudly displayed all over the walls. Gretchen occasionally visited him there, and he frequently claimed he was

improving the property "for her" but they both knew it was a lie. The Metter property was his baby.

He became more insistent that his wife find a way to embezzle more money, but there was a problem. Even though the rebates checks had stopped, Everett's explosive temper had not. When Gretchen asked him, "Why can't we just use what we have?", he informed her he owed Howard's Pawn Shop approximately $125,000 for purchases already made. Gretchen never made a single purchase from Howard's, and she had no idea how he could have spent so much money there.

Desperate to pay his Howard's tab, Everett raged, "I owe Howard's for stuff I bought because I was depending on the deposits." He insisted that Gretchen arrange for a way for Swisher to pay off the debt. In fact, he wanted her to forge a check to herself to pay for his purchases, even though he knew doing so would be a huge red flag to the company's auditors.

She refused, but she knew Everett would not stop until she found a way to steal more money, but she stayed silent, hoping he would move on to other concerns. With Everett's growing debt of over $100,000, however, her hope was misplaced. For almost a month, Everett hounded her every day, demanding, "When are the deposits coming?" He dropped any pretense these funds represented bonuses. He ramped up the physical and emotional abuse, making sure she knew to get him

money "or else". When she asked him how much he needed, he came up with the figure of $125,000.

Shocked but not surprised, Gretchen created an invoice to Swisher with Howard's name and address, designating the cost as marketing and advertising. She was aware of the advertising department's huge budget and hoped the invoice would go unnoticed, at least for a time. She then forged her supervisor's signature and coded the check as advertising. She printed out the invoice and put it in the box by the clerk's desk for payment. At the end of the day, the checks were printed and mailed directly to Howard's.

All was not well within Howard's, however, as checks written on Swisher's account, but paying for Everett's private purchases, raised the suspicions of one of Howard's owners. After the check arrived, Everett went to Howard's and was told the business had questions about the validity of the check. He called Gretchen and demanded she assure Nathan, one of the owners, the check was "legitimate." Gretchen did as she was told.

Two months later, after yet another check was issued to Howard's, Everett once again told Gretchen he owed Howard's more money. With the tax rebates still unavailable, Gretchen asked him if he wanted her to write a check to Howard's. "No" Everett replied, "Miss Deb says she won't take another check from Swisher." Even the owners of Howard's knew that something was not right with the Swisher

checks. Why would Gretchen's employer be paying the bill for Everett's purchases? Everett was furious at Howard's but the owners stood firm. No more Swisher checks.

Everett demanded his wife find another way to steal Swisher's money, telling her he was "depending" on those deposits, specifically blaming her for his inability to pay for his toys. "You told me they were coming. You have ruined my plans." As he did throughout their relationship, he blamed his wife for failing to deliver on her "promise" to help pay off the Howard's debt. He had very expensive plans for "his money" and he demanded to know when the tax rebates would be reinstated. When he learned there was no set date for resumption of the tax rebates, he told her he "had bills to pay" for the improvements to the Georgia property.

He then asked Gretchen if the checks could be made out in the name of Lodge and Anchor, a company owned by his friend John Garrard. Gretchen did not even know John owned a company, but Everett told her they could siphon the stolen money using John's business account so long as they gave John a cut of the money. Gretchen did as instructed and forged a series of checks payable to John's company. Although Gretchen was not privy to the details, she knew John deposited the fraudulent checks into his account and then transferred the funds to an account controlled by Everett, with John first taking his "cut" of the money. Checks totaling over $130,000 were also issued to First Coast Diesel, a company owned by Everett's

father, under an arrangement between Everett and his dad that Gretchen was not privy to.

During this time, Gretchen switched the name of the company issuing the checks from AES, a subsidiary of Swisher, to Swisher itself. After this switch, the maximum amount Gretchen could steal was $50,000 (due to internal company controls). This reduction in funds greatly angered Everett, who told her she needed to double the amount of checks issued to make up the difference.

By now, Everett was spending money as if he owned a printing press. Gretchen knew nothing was going to be enough to him. She also knew that their crimes would inevitably be discovered. When asked why she continued writing more checks in light of this knowledge she said, "Going to prison seemed to be a better option than facing Everett's anger" if she did not get him the money he insisted he "deserved".

Not a day went by that Gretchen did not worry about the consequences of her theft. She told Everett they had stolen millions of dollars. His response was, "It's not that much." He went to the desk where she was sitting, stood over her and said, "Well, you're going to get more, right?" When she said yes, he immediately instructed her to write three checks that week, instead of the usual two, so "I have everything done at the farm." In March of that year, Everett wrote a $50,000 as a deposit on the property across the street from his farm.

The Camp marriage was effectively over, replaced by a criminal enterprise whose sole purpose was to steal money to satisfy Everett's unsatiable appetite for "stuff". He had moved to the farm fulltime, returning once a week to make sure their scheme was still producing revenue. Gretchen travelled to the farm a half dozen times, but did not stay long. Guns, cars, gold coins, ATV's - the piles of adult toys for Everett grew even larger. Everett even bought horses, claiming he did so for his wife, although she had never ridden a horse in her life and had no desire to do so.

Unknown to her, Everett also began a series of sexual liaisons with a number of women. Gretchen once saw a "bag" of Viagra in his safe but was afraid to ask him why he had it. He held court at a local Mexican restaurant, where he represented himself out to be a wealthy businessman. Not once did he ever tell people who inquired that the "success" belonged to his wife. When he did not think it mattered, he eagerly claimed to be the source of the couple's wealth.

It was only a matter of time before an audit revealed the massive fraud perpetrated by the Camps. When confronted, Gretchen immediately confessed to her guilt, but did not disclose the extent of the theft, or the extent of her husband's involvement in it. Still living in fear of her husband, she attempted to convince seasoned investigators that Everett was unaware of the theft. The problem was that despite his protestations of innocence, Everett had left a trail of incriminating evidence. In fact, over $130,000 worth of checks were made payable to Everett's

father and Everett certainly knew that his father had done nothing to receive these funds from Swisher. Of course, the most significant problem was the fact that Everett was the person who controlled the stolen funds and decided how they would be spent.

### D.    Everett's Lies About the Couple's Source of Wealth

As previously noted, Everett concocted a story about their unexplained wealth. Notably, perhaps because he knew it was not credible, he did not tell people about his wife's fabulous employment at a salary more appropriate for a CEO than an account manager's. Nor did he make any other claim that the money was derived from his wife's labors. When picking up large group tabs, as he was prone to do, he did not thank his wife for her generosity. Instead, Mr. Camp told all who would listen of his exceptional skills brokering goods for transport by truck. Since he had been employed in this field, he was very familiar with how excessive loads are bid, and he made sure his wife knew just enough to answer questions about how he could be making so much money in the transport business.

He also frequently bragged that his lifestyle was the result of a large inheritance he had received. Indeed, Mr. Camp was the beneficiary of an inheritance and his mother came from a family of means. None of the money used to fund the cars, the guns, the properties and all the toys that he kept in Georgia came from any inheritance. Rather, it was obtained solely as the result of the Swisher theft. Everett

lied because he knew no one would believe his wife was being paid millions of dollars by her employer. His lies are yet more evidence that he was fully aware the money he was spending had not been "earned" by his wife.

### E.   Tourette's or Bad Behavior?

Early in their marriage, Everett told his wife he suffered from a number of psychiatric and medical conditions. Including ADHD, depression, bi-polar, and Tourette's. He showed Gretchen a pill box containing the medication and asked her if he should continue taking it. She told him it was up to him as she was unfamiliar with his medical history. Before that day, Gretchen had never seen those medications. After that day, she never saw them again, nor did she see him take any medications. To her knowledge, he never went to the doctor while they were married.

Tourette's syndrome is a "disorder that involves repetitive movements or unwanted sounds (tics) that can't be easily controlled". [Mayoclinic.org] For instance, a person might repeatedly blink their eyes, shrug their shoulders, or blurt out unusual sounds or offensive words. Everett never displayed these spontaneous symptoms, although he did suffer from some of the conditions associated with Tourette's, but also which can indicate other conditions - including anger management issues.

Especially in public, Everett spoke and acted inappropriately, doing things like telling racist jokes but blaming his medical condition when challenged about his conduct. He would joke about Gretchen being "trash" and restrict her food and drink because she was "fat." Often, he would publicly lose his temper and unleash a stream of profanity laced abuse on the person who had angered him. None of these outbursts, however, were involuntary, but were instead within his control. When people reacted in surprise or disapproval, Everett laughed it off and blamed his behavior on his Tourette's. He actually warned people about his inappropriate comments in advance, as if to build an excuse for his conduct. Yet, at least in his wife's presence, he never exhibited any of the physical manifestations of Tourette's Syndrome. Once he discovered its effectiveness in explaining his otherwise offensive and abusive comments, it became his go to excuse for his bad behavior. After a while, people came to overlook his behavior because "it was just Everett being Everett." Still, when convenient, he relied on this claim condition.

## IV.

### TEXTS AUTHORED BY MR. CAMP
### SUBSTANTIATE HIS ABUSE

Throughout the commission of their crimes, Everett insisted his wife delete her texts daily, and she dutifully complied. He went so far as to insist she send him confirmation that the texts were gone or he would demand that she actually show him she had done so. She continued to delete the texts until after an incident on the

Dames Point Bridge after her second arrest terrified her and awakened her to what her husband was capable of doing to her.

Furious when he picked her up from the jail, he demanded she "confess" his innocence and claimed he knew nothing about her scheme. She foolishly disagreed, challenging him about where the money went, so he ripped the rearview mirror off of the windshield of her car and beat her violently with it, all attempting to grab the steering wheel and force the car off the bridge. He continued to assault her when they arrived to their home, the home he had already told her she would have to immediately vacate. A thrown box bloodied her further. [Attached as Exhibit B are pictures of the injuries Ms. Camp suffered that day]. She was never to return to the home to live, although she did return to regrout Everett's shower - at his insistence.

As he had done so many times in the past, Everett extracted a promise from her that day, namely that she would do everything in her power to get the charges against Everett dismissed. She inquired of her attorney about whether an affidavit exonerating her husband would persuade the investigators of Everett's innocence, but the documentary evidence strongly implicating him was overwhelming. He was seemingly oblivious to what the investigation had uncovered, insisting his fate was solely within Gretchen's control. His increasing demands were placing her physical safety at risk, as he threatened to "wipe out entire families" and told her "I will take your arms and legs if I go away. I will make it so I live and you can't kill yourself"

[Exh C, p.2, 4:19 p.m.] and "U better pray and do whatever it takes to fix it. If anything happens to me your life and your friends no longer exist." [Exh C p.2, 4:23 p.m.]. "When I get out Bryan and the prosecutor and u and your friends and family won't exist" [Exh C, p.2, 4:45 p.m.]. Everett became more threatening and uncontrollable when he learned that her attorneys would not participate in a fraud on the court.

Indeed, the more Everett was told that such affidavit was a fool's errand, the angrier he became. He fired his first counsel because the lawyer refused to participate in Everett's scheme. When he hired substitute counsel, his campaign of coercion became frenzied and frightening. Gretchen was going to sign a false exculpatory affidavit or, he threatened, face the extinction of everyone she loved.

For the first time in her marriage, Gretchen began to question her continued protection of her husband. Unbeknownst to Everett, Gretchen was no longer obeying his daily demand that she "delete his texts." Attached as Exhibit D are the entire texts between the two from January 2019 through May 2019, the period of time during which Everett was almost hourly demanding she sign a false exculpatory affidavit.

The "promise" Everett extracted from his wife during his assault of her on the Dames Point Bridge became his drumbeat. He now used this "promise" to claim it was her idea to falsely exonerate him. Once again, as is evidenced by the texts

themselves, she was afraid to tell him no. Ultimately, she signed the affidavit which is attached as Exhibit E and his counsel attached the affidavit to a motion filed in the state proceedings - despite having previously been advised by Gretchen's counsel, by email. *See* attached Exhibit F.

Indeed, the path to the signing of this affidavit is the best evidence of the manipulation and threats of violence against Gretchen, her friend, family and even her lawyer, employed by Everett to, once again, act both against her own self-interest and her moral code. These texts conclusively establish who was in control of the relationship and how he used that control against his wife. In short, they are a front row seat into precisely how he manipulated his wife throughout their marriage.

He begins his text with a threat: "U wrecked my life. Because if u live when I get out I promise u that your friends and family and u won't be pleased with their lives. U f***ed up mine and I will return the favor 100 fold." [Exh C, p.1, 3:48 p.m.]. "So I'm warning u u had better do it." [Exh C, p.1, 11:31 a.m.]. "I will wipe family names out." [Exh C, p.1, 3:52 p.m.] (emphasis added).

Two days later, he texted her "I'm throwing s*** and hitting s***… Either sign it or go to war… If you don't there will be consequences." [Exh C, p. 3, 9:09 a.m.] In the span of 48 hours, he had threatened to kill Gretchen and everyone she loved, threatened to cut off her arms and legs and told her he had no compunction

about hiring a hit man to because, "like u said god can just forgive us right." [Exh C, p. 2, 6:51 pm].

The substitution of Mr. Camp's counsel threw gasoline on an already smoldering flame, because, at least according to Everett, Everett's fate was now wholly dependent upon the willingness of his wife to sign a false statement exonerating him. Everett began demanding that Gretchen hide the proposed affidavit from her lawyer, frequently threatening Mr. DeMaggio in particular due to his refusal to go along with the fraud. In fact, he texted her both the actual e-mail sent by Mr. DeMaggio to Mr. Fallgatter, along with a text from his attorney, stating, "Bryan clearly thinks you are guilty and does not want his wife to help us. He told me he did not think she would be able to exculpate you, but he would study the affidavit I sent him." Everett then texted "U see. So are you gonna let Bryan f*** with me or what." [Exh C, p. 3, 12:10 p.m.]

He texted, "I told Curtis that u agreed to sign a waiver Tuesday and meet there [at Curtis Fallgatter's office] to sign the divorce document… Maybe you should find a new attorney." [Exh C p.3, 2:43 p.m.]. Undeterred, Mr. Camp, with the apparent agreement of his counsel, decided to have his attorney handle signing both the affidavit as well as a waiver of her legal rights in a divorce action not yet filed. To be clear, after Mr. DeMaggio informed Mr. Fallgatter that any affidavit exonerating his client would be perjurious, Everett continued to text Gretchen insisting that she

sign it. He told her that her lawyer was not representing her interests and that there was nothing improper about her meeting with Mr. Fallgatter to sign the affidavit.

He then sent a draft of the affidavit, which she refused to sign. Twice he came to her home, unannounced and uninvited. During his first unannounced visit, he began videotaping her and she told him to go away. He wanted to record her saying he was innocent. She refused and he ultimately left.

The next visit escalated Gretchen's fear. She had changed the code to her front door, but Everett was not to be deterred. Guessing the code she used from her past usage, he entered the apartment unannounced while she was asleep. She woke up to find him standing at the bedroom door. Again, he demanded that she sign the false affidavit, asking, "Do you want me to throw you over the balcony?" He told her she was going to sign the affidavit "or else." To get him to leave, she "promised" him to sign the affidavit. Two days later, Gretchen signed the false affidavit.

In the days leading up to the break-in, he texted, "I'm f***ing p***ed. I'm ready for this s*** to go down now" [Exh C, p.4, 6:04 p.m.] "I don't care anymore. Nobody better f*** with me. I've been calm and nice. I'm done with that now" [Exh C, p.4, 6:07 p.m.]. "I found someone, now I expect every cooperative move from you and Bryan. I don't care what happens to you" [Exh C, p.4, 6:57 p.m.]. "I am the victim. If s*** gets any worse for me u won't need to worry about prison because I'm coming to get u" [Exh C, p.4, 8:18 p.m.]. "Do not show Bryan anything" [Exh

C, p. 4] When Gretchen refused to lie, he responded "God would see it as cleaning up the mess." [Exh C, p. 4, ___].

He continually threatened her, telling her, "U f****** with the wrong person u lying scum bag... I'm going to bring u all down" [Exh C, p. 10, 2:11 p.m.] "I have a chance to get off... If you waste my money one more time I will do something that ur not going to like. U don't hold the cards here u don't bully me." [Exh C, p. 10, 3:49 p.m.] "Ur about to push me to a place you do not want me to go." [Exh C, p. 10, 9:21 p.m.] The following day he texted, "I am done with games. I will just lose a 40K more and f*** everyone up. Idc" [Exh C, p. 12, 5:09 p.m.] This text referred to a prior conversation when Everett told Gretchen he had located a hit man to kill everyone she loved plus, again for good measure, her attorney.

He cajoled her, claiming his new lawyer was going to use the innocent spouse defense and once accepted, he could sell the Metter property and the condominium they had purchased just months before their arrest at a profit. Everett promised to use the profit to pay the restitution Gretchen would owe. He also told her she needed to hire another attorney because her attorneys were not representing her adequately. Of course, when those promises did not produce the desired result, he again told her, "You're the stupidest b**** alive." [Exh C, p. 5, 8:38 p.m.] "I will break your f***in neck if I see u again... All you cared about was counseling and being married. That's f***in crazy." [Exh C, p. 5, 10:34 a.m.]

For once, Everett's statement about what was important to his wife was correct. Despite the violence, the threats, the emotional abuse and the broken promises, Gretchen Camp clung to the sunken wreck of her marriage because, all she cared about was saving her relationship with her abuser. Torn by both love and fear, Gretchen attempted to navigate giving Everett the demanded affidavit without perjuring herself and without telling her lawyers she was doing so. Both she and Everett knew that Gretchen's lawyers wanted no part of the affidavit.

The two went back and forth until "they" produced an affidavit which was both satisfactory to him and a nod to her concerns that she not tell any more lies about what the two of them had done. Once again beaten down by the steady onslaught of promises and threats, she signed the affidavit without mentioning its existence to her lawyers. She understood Everett's unannounced and unwelcome early morning visit to her condominium and his threat to "throw her over the balcony" was not an idle one. She began the doomed dance of placating her husband's demands yet once again. To be clear, at the time the affidavit was signed, both Everett and his attorney had been put on notice the affidavit was false. Nonetheless, not only did Everett's efforts continue, on counsel for Everett filed a Motion to Dismiss and/or Vacate Arrest Warrant, attaching the false affidavit in support of both his request to dismiss the charges and his motion to set aside the revocation of his bond. It was only then that Gretchen's lawyers were made aware

of its existence; prior to the filing, Everett's counsel did not reveal its existence to them.

If Mr. Camp and his counsel believed the affidavit would exonerate him, they were surprised by the reaction it generated. Finally, the scales were removed from her eyes, and Gretchen began to accept that she had been manipulated by her husband to once again act in a manner contrary to both her own interest and the religious beliefs she held so dear. This event became the turning point for Gretchen Camp; it was only then that she began the difficult work of facing the reality of her marriage and accepting she had been abused by her husband for years.

By then, Mr. Camp was incarcerated at the Duval County Jail due to the violation of conditions of his bond and he has been detained since. His incarceration gave Gretchen the opportunity to examine what she had done and how her relationship with him contributed to her willingness to steal millions of dollars from her employer.

She became committed to discovering the truth about herself, and her marriage. She provided the Government with information to assist in its investigation and undertook all actions requested of her including consenting to the entry of a forfeiture and civil judgement against her. She also produced the cellphones she had and the text messages which are attached to this memorandum. She sought extensive counseling from Linda Yeldell and was examined by Dr. Harry

Krop, both of whom will be testifying on her behalf at sentencing. At every opportunity, she has undertaken affirmative steps to free herself from the beliefs that kept her bound to her abuser.

## V.

## APPLICABLE LAW AND ANALYSIS

### A.  <u>Sentencing Overview</u>

This case presents facts and circumstances of a kind, or to a degree, not adequately considered in the Sentencing Commission's formulation of the guidelines, and the circumstances of the offense and nature and characteristics of the accused warrant a sentence below the guidelines range pursuant to 18 U.S.C. § 3553(a).   Accordingly, Ms. Camp respectfully requests this Court to impose a sentence which departs and/or varies below the recommended guideline sentence.

Sentencing under the advisory guidelines following *United States v. Booker*, 543 U.S. 220 (2005), requires two steps. First, a court should calculate the applicable sentencing range under the United States Sentencing Guidelines.  *United States v. McVay*, 447 F.3d 1348, 1353 (11th Cir. 2006).  Second, the Court should impose a sentence that is reasonable in light of all of the factors set forth in 18 U.S.C. § 3553(a).  *United States v. Talley*, 431 F.3d 784, 788 (11th Cir. 2005). A reasonable sentence is one that is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are retribution, deterrence, incapacitation and

rehabilitation.  *See* 18 U.S.C. § 3553(a). After determining the advisory guidelines range, the Court considers the applicable statutory sentencing factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law and to provide for just punishment; (3) the need for deterrence; and (4) the need to avoid unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a); *Talley*, 431 F.3d at 786.

**B.**   **Advisory Guideline Range**

The Probation Officer has calculated an advisory guideline range of 63 to 78 months, resulting from total offense level of 26 and Criminal History Category I. However, the Government has filed a motion for downward departure requesting a reduction of two levels in Defendant's offense level (Doc. 30). Such a reduction would result in a total offense level of 24 and corresponding guidelines range of 51 to 63 months. Furthermore, Ms. Camp has also moved for a downward departure pursuant to § 5K2.12 seeking an additional four level reduction in her offense level, which combined with the Government's request, would place her at a total offense level of 22 and corresponding guidelines range of 41 to 51 months.  Nevertheless, in either event, the guideline range offers no useful advice and should not be heeded because it (1) is the product of a guideline that is not based on empirical evidence or national experience; (2) fails to take any account of Ms. Camp's culpability, low risk

of recidivism, need to make restitution, or collateral punishment; (3) would result in unwarranted disparity as compared with sentences for similarly situated defendants; and (4) is far greater than necessary to promote the goals of sentencing in this case.

## VI.

### A SENTENCE OF 24 MONTHS WOULD BE BEST SATISFY THE GOALS OF 3553(a).

The fraud guideline is centered on loss calculations, but other factors must be considered. "While the fraud guideline focuses primarily on aggregate monetary loss and victimization, it fails to measure a host of other factors that may be important, and may be a basis for mitigating punishment, in a particular case." Allan Ellis, John R. Steer, Mark Allenbaugh, *At a "Loss" for Justice: Federal Sentencing for Economic Offenses*, 25 Crim. Just. 34, 37 (2011); *see also United States v. Ovid*, 2010 WL 3940724, *1 (E.D.N.Y. Oct. 1, 2010) ("[T]he fraud guideline, despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences, and indeed no workable guideline could ever do so."). A substantial variance is needed in this case because of the following mitigating factors, all of which are highly relevant to the purposes of sentencing and none of which is taken into account by the guideline range.

**A.** <u>**Need for Just Punishment in Light of the Seriousness of the Offense**</u>

The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and

seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (February 2005). These issues are addressed below.

### 1.    Degree of Intent (Mens Rea)

As stated by the court in *United States v. Gaviria*, 804 F.Supp. 476, 479 (E.D.N.Y. 1992):

> Whether a particular defendant committed her crimes under the influence of a pattern of emotional and physical abuse is relevant to blameworthiness. Incarceration of such a defendant might not serve the statutory objectives of specific or general deterrence, incapacitation, rehabilitation and retribution that normally motivate sentencing decisions.
>
> A downward departure from the Guideline range is warranted when a woman's status as a victim of systematic physical and emotional abuse substantially lessens her blameworthiness, notwithstanding her legal guilt. Such a departure may be based upon the authority of Guideline § 5K2.12 or independently upon Congress's directives in 18 U.S.C. § 3553 or upon both.

As mentioned above, Ms. Camp has moved for a downward departure pursuant to USSG § 5K2.12 and *Gaviria* and its logic for the same are covered

extensively in that motion. Nevertheless, Ms. Camp submits that not only is a departure warranted here for those reasons, but such reasons also support a variance upon Congress's directives in 18 U.S.C. § 3553 as well.

### 2.     Ms. Camp was not motivated by improper purposes

A defendant's motive is highly relevant at sentencing. *See Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993); *United States v. Mahan*, 232 Fed Appx. 796, 799 (10th Cir. 2007) (sentence was procedurally unreasonable where district court refused to consider defendant's stated motive for possessing unloaded shotgun, *i.e.*, that he had been violently beaten by three men and sought to defend his wife); *United States v. Milne*, 384 F. Supp. 2d 1309, 1310-11 (E.D. Wis. 2005) (granting variance where "defendant did not take the bank's money out of greed or a desire to live a lavish lifestyle for herself, [but in effort] to keep a sinking business afloat"). In short, this case is distinguishable from a case in which a defendant misappropriated money to support her own lavish lifestyle. Ms. Camp diverted funds to satisfy her threatening and controlling husband and stave off further abuse from him. Indeed, when one looks at who spent the overwhelming majority, if not totality, of the proceeds here, this becomes all the more evident and obvious. It was the programmed subservience to her husband and its resultant coercion upon Ms. Camp that set this conspiracy in motion.

### 3.    Ms. Camp has been punished.

This Court should consider Ms. Camp's loss of profession and reputation. Ms. Camp enjoyed an outstanding reputation in the community because of who and how she is, as the Court can discern from the letters of support on her behalf. The news publicity of the charge against her has severely tarnished her reputation and caused not only termination of her employment in the highly respected field of accounting, but also will surely preclude her from ever working in that field again. Thus, Ms. Camp has suffered severely even prior to being sentenced. The circumstance also supports a downward variance. *See, e.g.*, *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was punished by the loss of his business); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation, widespread media coverage, and emotional toll of two lengthy public trials); *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (granting variance in part because the defendant lost a good public sector job as a result of his conviction). Accordingly, the Court should vary below the guidelines range in fashioning its sentence in this case.

### 4.    Need for Deterrence

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield

46

significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.*; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."). Furthermore, research regarding white collar offenders in particular (presumably the most rational of potential offenders) has found no difference in the deterrent effect of probation and that of imprisonment. *See* David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); *see also* Gabbay, *supra*, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

### 5. Need for Incapacitation: Ms. Camp poses an exceptionally low risk of recidivism.

Ms. Camp is a first offender, who has been employed throughout her adult life. For offenders in Criminal History Category I, the recidivism rate is 10.0% for females. The rates decline with increasing age, education, and history of employment and marriage. *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The*

*Criminal History Computation of the Federal Sentencing Guidelines,* at Exh. 9, at 28; Exh. 10, at 29 (May 2004) [hereinafter *Measuring Recidivism*]. For all Category I defendants convicted of fraud, the recidivism rate is just 9.3%, the lowest of any offense category, which is 45% below the rate for all fraud offenders. *Id.*, Exh. 11, at 30. Finally, offenders like Ms. Camp with zero criminal history points have a rate of recidivism half that of offenders with one criminal history point. *See* Sent'g Comm'n, *Recidivism and the "First Offender,"* at 13-14 (May 2004) [hereinafter *First Offender*].

The Commission has recognized the advisability of revising the guidelines to take age and first offender status into account. *See First Offender* at 1-2 (identifying goal of "refin[ing] a workable 'first-offender' concept within the guideline criminal history structure"); *Measuring Recidivism* at 16 (noting that "[o]ffender age is a pertinent characteristic" that would "improve [the] predictive power of the guidelines "if incorporated into the criminal history computation"). The Commission has not implemented any such revisions to the criminal history guidelines, but has stated that age "may be relevant" in granting a departure. U.S.S.G. § 5H1.1, p.s.

This Court should consider the statistically low risk of recidivism presented by Ms. Camp's history and characteristics. *See, e.g.*, *United States v. Darway,* 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of

defendant's first-offender status); *United States v. Urbina*, 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders");*United States v. Ward,* 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense).

### 6. Need to Avoid Unwarranted Disparities and Unwarranted Similarities

The Court must consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct. 18 U.S.C. § 3553(a)(6). The Court should avoid unwarranted similarities in sentencing among defendants who are different in their histories and conduct. *See Gall v. United States*, 552 U.S. 38, 55 (2007) ("need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated") (emphasis added); *United States v. Ovid*, 2010 WL 3940724 (E.D.N.Y. 2010) (sentencing two defendants with similar guideline ranges to 60 months and 126 months respectively based on distinctions in circumstances of the offenses and characteristics of the defendants). The Court should avoid unwarranted differences in sentences among defendants

whose conduct and characteristics are similar. *See United States v. Parris*, 573 F. Supp. 2d 744, 753, 756-62 (E.D.N.Y. 2008).

In the first quarter of fiscal year 2021 (Oct. 1, 2020-Dec. 31, 2020), sentences below the guideline range were imposed in approximately 58% of all fraud cases. *See* U.S. Sent'g Comm'n, *Quarterly Data Report, Fiscal Year 2021-1st Quarter Preliminary Cumulative Data*, at Tables 11, 18. The mean and median of sentences in all fraud cases during the period was 20 and 10 months respectively. *Id*. at Table 6. This number is consistent with fiscal year 2020, where sentences below the guideline range were imposed in approximately 53% of all fraud cases, with mean and median sentences for all fraud cases coming in at 19 and 8 months, respectively. *See* U.S. Sent'g Comm'n, *Quarterly Data Report, Fiscal Year 2020*, at Tables 6, 11, 18. Given all of the facts at play here, Ms. Camp should likewise be sentenced below the guidelines and in accordance with those mean and median sentences.

### 7. Need to Provide Restitution to Victims of the Offense

In determining the appropriate sentence, this Court must consider "the need to provide restitution to any victims of the offense." *See* 18 U.S.C. § 3553(a)(7); *see also*, *e.g.*, *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) (acknowledging district court's discretion to depart from guidelines to impose probationary sentence, since the "goal of obtaining restitution for the victims of Defendant's offense . . . is better served by a non-incarcerated and employed

defendant"); *United States v. Peterson*, 363 F. Supp. 2d 1060, 1061-62 (E.D. Wis. 2005) (granting a variance so that defendant could work and pay restitution). This Court should seek to maximize, rather than eliminate, Ms. Camp's ability to make any required restitution, and she must be able to be employed in order to do so.

### D. The guideline range provides no useful advice because it is not based on empirical evidence or national experience, and fails to promote any purpose of sentencing

The fraud guideline is not based on empirical data of past practice or on national experience since then. Because the Commission failed to rely on empirical data or national experience in promulgating or amending § 2B1.1, and thus failed to fulfill its institutional role, this Court is free to disagree, on reasoned policy grounds, with its recommendation. *See Pepper v. United States*, 131 S.Ct. 1229, 1245 (2011); *Spears v. United States*, 129 S. Ct. 840, 843 (2009); *Kimbrough v. United States*, 552 U.S. 85, 101-02, 109-10 (2007); *Rita v. United States*, 551 U.S. 338, 351, 357 (2007).

For example, the 1989 and 2001 increases in the fraud guideline led to the absurd result that first-time, nonviolent fraud offenders were subject to guideline ranges as high as those imposed on armed drug traffickers and even higher than those applicable to the most violent offenders. *Compare* U.S.S.G. § 2B1.1 (2001) (offense level 30 for loss over $7 million, sophisticated means, abuse of position of trust) *with*

U.S.S.G. § 2D1.1 (2001) (offense level 30 for trafficking in 3 kilograms of cocaine while possessing a firearm); U.S.S.G. § 2A2.1 (2001) (offense level 28 for assault with intent to commit first degree murder); § 2A4.1 (2001) (offense level 24 for kidnapping), U.S.S.G. § 2K1.4 (2001) (offense level 24 for arson creating substantial risk of death or serious bodily injury), U.S.S.G. § 2A1.3 (2001) (offense level 25 for voluntary manslaughter).

Moreover, while the amount of "loss" is the primary determinant of the offense level for fraud offenders, loss is a highly imperfect measure of the seriousness of the offense. *See United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud on the amount of actual or intended financial loss" without any explanation of "why it is appropriate to accord such huge weight to [this] factor [ ]"). The amount of loss is often "a kind of accident" and thus "a relatively weak indicator of [ ] moral seriousness . . . or the need for deterrence." *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004).

Finally, as mentioned above, sentences below the guideline range were imposed in approximately 58% and 53% of all fraud cases for fiscal years 2021 and 2020, respectively. "[S]ince *Booker*, virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high. This near unanimity suggests that the judiciary

sees a consistent disjunction between the sentences prescribed by the Guidelines for cases like these and the fundamental requirement of Section 3553(a) that judges impose sentences 'sufficient, but not greater than necessary' to comply with its objectives." Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After* Booker, 20 Fed. Sent. R. 167, 169, 2008 WL 2201039, at *4 (Feb. 2008).

A variance is necessary to do justice in this case and will also contribute to the evolution of responsible guidelines. As the Supreme Court emphasized, when judges articulate reasons for sentences outside the guideline range, they provide "relevant information to both the court of appeals and ultimately the Sentencing Commission," which "should help the Guidelines constructively evolve over time, as both Congress and the Commission foresaw." *Rita*, 551 U.S. at 357-58.

## VII.

## CONCLUSION

Gretchen Camp readily admits her culpability in the offenses for which she has pled guilty. She does not seek to excuse her behavior, as she understands that without her active participation, it could not have occurred. She feels immense guilt about how she misled her co-workers and employers, who were nothing but kind to her throughout her time with Swisher. She recognizes her life will be forever altered by the decisions she made. She now understands why she committed these crimes, and she is, for the first time in her life, publicly proclaiming her freedom from a

decade of abuse. Even in the face of actual incarceration, she is finally free of the

prison of abuse. She will never betray her moral values or her religious beliefs, again.

For the foregoing reasons, a sentence of twenty-four (24) motions is sufficient but

not greater than necessary to satisfy the purposes of sentencing.

Respectfully submitted,

*/s/Elizabeth L. White*
Wm. J. Sheppard, Esquire
Florida Bar No.: 109154
Elizabeth L. White, Esquire
Florida Bar No.: 314560
Matthew R. Kachergus, Esquire
Florida Bar No.: 503282
Bryan E. DeMaggio, Esquire
Florida Bar No.: 055712
Jesse B. Wilkison, Esquire
Florida Bar No.: 118505
Camille E. Sheppard, Esquire
Florida Bar No.: 124518
Sheppard, White, Kachergus & DeMaggio
215 Washington Street
Jacksonville, Florida 32202
Telephone: (904) 356-9661
Facsimile: (904) 356-9667
Email: sheplaw@sheppardwhite.com
COUNSEL FOR DEFENDANT

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 18th day of May, 2021, a copy of the

foregoing was sent to the following via CM/ECF:

> **Bonnie A. Glober, Esquire**
> **Assistant United States Attorney**
> **300 N. Hogan Street, Suite 700**
> **Jacksonville, Florida 32202**
> **Bonnie.Glober@USDOJ.Gov**

/s/Elizabeth L. White_____
**ATTORNEY**

ELW/km[Camp.Sentencing.Memorandum]